IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

BAD HOLDINGS, LLC,

                          Plaintiff,                          OPINION AND ORDER

    v.
                                                              21-cv-427-wmc

HALLIBURTON ENERGY
SERVICES, INC.,

                          Defendant.

Plaintiff BAD Holdings, LLC, claims that defendant Halliburton Energy Services, Inc., left its train cars on property belonging to BAD Holdings without paying storage fees. In turn, Halliburton brings counterclaims against BAD for replevin and wrongful conversion of those same cars. Now before the court is plaintiff's motion for partial summary judgment (dkt. #25) addressing both its claims for trespass, unjust enrichment and interference with business relations, and Halliburton's counterclaims.[1] For the reasons provided below, plaintiff's motion is rejected.

UNDISPUTED FACTS[2]

On December 1, 2020, BAD Holdings purchased out of receivership real property located in Barron County, Wisconsin. The property was previously owned by Northern Industrial Sands, LLC, and its associated companies (collectively known as "NIS"), which

---

[1] In addition, defendant's motion for leave to file a supplemental opposition brief (dkt. #56) is GRANTED, although it does not ultimately change the outcome of plaintiff's motion for summary judgment.

[2] Except where noted, these facts are undisputed for the purpose of the motion for summary judgment.

had stored railcars there, as well as loaded fracking sand for sale.  Before the receivership and sale of the property, Halliburton was a customer of NIS' fracking sand, and the two had entered into a Railcar Pooling Agreement, which among other things allowed NIS to use Halliburton's stored railcars to fulfill orders from other customers on an as-needed basis.  Other of NIS' customers had entered into similar pooling agreements, allowing NIS to load and transport sand in any of the pooled cars, regardless of the customer.  Under the term of their pooling agreement, NIS loaded with sand all 85 Halliburton railcars at issue in this case for delivery to a third party.

After a severe downturn in the fracking industry in early 2020, NIS' assets were placed in receivership by the Circuit Court of Barron County, Wisconsin.  A notice of receivership was then filed in May 2020, which instructed creditors like Halliburton to file claims against NIS by August 2020.  The court also authorized separate public auctions for NIS' real estate and other assets.

After receiving this notice, Halliburton filed a Proof of Claim in the receivership.  In response, NIS then emailed Halliburton directly on August 6, 2020, giving notice that:  (1) railcar owners should retrieve their cars from the property; and (2) Halliburton's cars were currently loaded with sand.  In particular, that email advised Halliburton, "Lessors/owners/customers/vendors can file in the receivership if they believe they are entitled to any amounts by NIS as the estate will not be paying for any shipment/return of the cars, from any and all locations."  (Pl.'s Rep. to Def.'s Resp. to Pl.'s PFOF (dkt. #47) ¶ 32.)  Nevertheless, Halliburton apparently made no attempt to retrieve its cars before November, 2020.

2

In late August of 2020, the underlying property was auctioned off to BAD.  On November 30, just before the closing and filing on December 1, 2020, of the deed conveying the property, BAD sent an email to the NIS receiver stating, "BAD does not agree to accept possession, expense, responsibility and/or any liability associated with the 439 railcars and the contents on site."  In reply, the receiver stated that her "email confirms the terms outlined below."  (Duke Decl. (dkt. #28-1) 1-2.)

Starting on November 10, 2020, however, Halliburton was in communication with BAD in an attempt to retrieve its cars.  Halliburton asked for updates on the cars several times and notified BAD that it couldn't accept the cars until they were unloaded.  On November 13, 2020, BAD replied to Halliburton that "[w]e are still working on finalizing the plans to empty the remaining cars.  Please bear with us."  (Atanasoff Decl. (dkt. #45-6) 5.)  Halliburton asked for another update six days later, to which BAD responded, "Thank you for checking in! We are still working out all of the details on how to proceed with everything."  (Id. at 4.)

On December 1, 2020, the date that BAD actually took possession of the property, Halliburton again asked, "What is the latest plan to get these cars unloaded?" to which BAD responded "We are still working out the details.  We will stay in touch with you." (Id. at 3.)  Halliburton asked for an update the next day, to which BAD replied, "[r]est assured we are working diligently to resolve this matter.  Thank you in advance for your patience."  (Id. at 2.)  Although it appears that BAD never provided a plan for unloading and retrieving the cars before the end of 2020, the parties discussed whether Halliburton

3

would be willing to purchase the sand already loaded in its cars from BAD between late December, 2020, and January 2021.

Halliburton next notified BAD on January 28, 2021, that it might be willing to purchase certain loads of sand, but for cars carrying sand that Halliburton did not need, "[w]e will need those cars emptied out prior to taking [them] back." (Atanasoff Decl. (dkt. #45-2) 5.)  Ultimately, Halliburton decided not to purchase any of the sand due to quality concerns.  (Id. at 1.)

On March 26, 2021, BAD asked Halliburton where to send invoices for the cars currently in storage.  Halliburton responded that the cars were not being stored; rather, Halliburton was waiting for BAD to unload the cars before taking possession, as noted by previous communications.  (Atanasoff Decl. (dkt. #45-16) 2-4.)   By April 23, 2021, Halliburton submitted a demand letter asking for its cars to be emptied out and returned, with Halliburton paying reasonable costs to move the cars but not any storage fees. (Carruth Decl. (dkt. #40-2) 1.)  On May 20, 2021, BAD refused and insisted that Halliburton pay storage fees *and* the costs of removing any sand.  (Carruth Decl. (dkt. #40-3) 1.)  This appears to be the first time that BAD told Halliburton that BAD would not remove the sand.

Since December 1, 2020, BAD has operated the property as railcar storage.  Before BAD's acquisition, Halliburton had paid no storage fees for the cars on the property, presumably because NIS was allowed to use those cars to transport sand.  Once BAD took control of the property, however, it began to charge between $4.50 and $6 per railcar per day for railcar storage, $350 per railcar to switch railcars, and $450 per railcar for cherry-

picking costs.  Switching and cherry-picking are operations used to extract certain railcars from a pool of cars and assemble the cars for transport.  Halliburton's railcars have been on the subject property since December 1, 2020, and all cars remain loaded with sand.  To date, Halliburton has paid no storage fees to BAD, and BAD has refused to incur the costs of removing sand from Halliburton's cars.

OPINION

Summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If there is any genuine issue as to any material fact, the court cannot grant summary judgment.  *Id*.  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted).  Finally, "[t]he evidence of the non-movant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor."  *Id*. at 255.

## I.    Ownership of Sand

As a preliminary question, a disputed question of fact is whether BAD owns the sand in the Halliburton railcars.  To begin, NIS previously loaded the sand in Halliburton's railcars before going into receivership, and the sand was abandoned prior to BAD taking title of the property, given the reasonable "infer[ences] from 'words spoken, acts done, and other objective facts' whether [NIS] 'voluntarily discarded, left behind, or otherwise

5

relinquished [its] interest in the property in question.'" *Bond v. United States*, 77 F.3d 1009, 1013 (7th Cir. 1996) (citing *United States v. Ramos*, 12 F.3d 1019, 1022 (11th Cir.1994).) Moreover, as a defunct entity, NIS is unable to take responsibility for the sand. The real question is whether BAD assumed ownership of the sand at some point.

Before BAD's purchase, the receivership sold much of the personal property on the parcel to third-parties, who were notified on October 1, 2020, that "any equipment left at the dry plant property after October 31, 2020" will be considered "to have been abandoned to the receivership estate and any such equipment will be sold along with the real estate." (Atanasoff Decl. (#45-10) 1.) The sand was never claimed by NIS or a third party before the receivership conveyed the property to BAD. After purchasing the real estate, BAD emailed counsel for the receivership in November, 2020, to confirm that "BAD does not agree to accept possession, expense, responsibility and/or any liability associated with the 439 railcars and the contents on site." (Duke Decl. (dkt. #28-1) 2.) Lauren Stanley, representing the receivership, replied that she "confirmed the terms outlined." (Id. at 1.) Despite this, BAD attempted to sell the sand loaded in the Halliburton railcars in December 2020, to Halliburton and other third parties, offering a reduced price per ton due to quality concerns. (Atanasoff Decl. (dkt. #45-2) 5.)

Ultimately, the word "property" is used to "denote the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it." *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378 (1945). Here, BAD both possesses the sand and has attempted to dispose of it via sale. While BAD argues that its November

6

email disclaimed all responsibility for the sand, its attempt to sell the sand later muddles the picture, since that suggests some claim of ownership.

Certainly, the fact that BAD is in physical possession of the sand *and* tried to sell it strongly suggests that BAD has an interest in the sand. Meanwhile, Halliburton has never possessed or claimed the sand; indeed, Halliburton has continuously disclaimed responsibility for it. Thus, the question of whether BAD ever assumed ownership of the same will be for the jury to decide. With this in mind, the court turns to plaintiff's motion for partial summary judgment.

## II.   Trespass

Under Wisconsin law,

> One is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally
> (a) enters land in the possession of the other, or causes a thing or a third person to do so, or
> (b) remains on the land, or
> (c) fails to remove from the land a thing which he is under a duty to remove.

*Manor Enterprises, Inc. v. Vivid, Inc.*, 228 Wis. 2d 382, 389–90, 596 N.W.2d 828, 831–32

(Ct. App. 1999) (quoting Restatement (Second) of Torts § 158 (1965)).

Here, Halliburton has arguably trespassed by failing to remove its train cars from

BAD Holdings' property. For such situations,

> A trespass may be committed by the continued presence on the land of a structure, chattel, or other thing which the actor or his predecessor in legal interest has placed on the land . . . with the consent of the person then in possession of the land, if the actor fails to remove it after the consent has been effectively terminated

7

*Id*. at 90 (quoting Restatement (Second) of Torts § 160 (1965)).

BAD argues that Halliburton prima facie meets these trespass requirements, as the train cars are on BAD's land without its consent.  This strikes the court as correct. Wisconsin courts have held that failure to remove property from another's land is trespass. *Manor*, 596 N.W.2d at 835 ("[Defendant] has a duty within the meaning of § 158(c) of the Restatement to remove" remaining personal property when consent is revoked). Defendant offers no contrary caselaw or reasons for distinguishing this case.  Instead, Halliburton argues that it did not have a reasonable opportunity to retrieve its cars. Because Halliburton has raised genuine disputes of material fact as to its ability to retrieve the cars, BAD is not entitled to summary judgment on the trespass claim.

After consent is revoked, "one entitled to the immediate possession of the thing is privileged . . . to be on the land at a *reasonable time for the purpose of removing the thing in a reasonable manner and with reasonable promptness*, unless he knows or has reason to know the time of such termination or suspension a reasonable period in advance." Restatement (Second) of Torts § 177 (1965) (emphasis added).  Halliburton argues that it did not have reasonable opportunity to retrieve its cars for several reasons: the cars are loaded with sand, interspersed throughout the railyard, and BAD will not release them without defendant paying storage fees.  Of these arguments, the court is most persuaded by those regarding the storage fees.

While Halliburton has acknowledged in deposition that BAD's proposed costs for switching and cherry-picking are reasonable, it unequivocally disputes that it owes any storage fees to BAD.  Thus, because BAD refused to release the cars without payment

before notifying Halliburton a storage fee would be charged, a reasonable jury could find that Halliburton was not given a reasonable chance to retrieve its cars.  In particular, BAD never alerted Halliburton that it would charge storage fees if the cars were not picked up by a certain date.  Instead, the evidence suggests that when Halliburton contacted BAD for retrieval, it was told that fees had already accrued and would need to be paid before accessing the cars.  (Atanasoff Decl. (dkt. #45-16) 2-4.)  There is no evidence that Halliburton had previously been paying storage fees to NIS, nor that BAD informed Halliburton that it would start charging storage fees if the cars were not removed by a certain date.  Instead, BAD relies on the fact that "Halliburton [] had nearly four months to get its railcars off the Subject Property prior to BAD Holdings' closing on December 1, 2020 and failed to do so," suggesting that the cars themselves are mechanically sound and Halliburton could have obtained a court order to retrieve the cars.  (Pl.'s Rep. (dkt. #48) 10.)

However, this argument ignores the extensive email communications showing that Halliburton was doggedly pursuing the return of its cars, with BAD continuously asking for more time to figure out how to return the cars.  BAD continued to demur after taking possession of the property, stating on December 2, 2020, that Halliburton could "[r]est assured we are working diligently to resolve this matter.  Thank you in advance for your patience."  (Atanasoff Decl. (dkt. #45-6) 2.)  Thus, a reasonable jury could conclude that Halliburton had no obligation to retrieve its cars before December 1, 2020, when BAD was telling Halliburton that a plan was in the works, and it should simply wait.  Moreover, to the extent that the cars were on BAD's property after December 1, 2020, that appears to

9

primarily be BAD's fault.  Given these facts, a reasonable jury could find that Halliburton
was not given a reasonable opportunity to retrieve its cars, serving as a defense to trespass.

Additionally, as previously noted, the emails between the parties are also evidence
that BAD was planning to unload the sand from the cars, or at least represented as much
to Halliburton.  By equivocating when Halliburton asked for the plan and timeline to
remove the sand, BAD arguably prevented Halliburton from retrieving its railcars or
making alternative arrangements.

### III.    Unjust Enrichment

Under Wisconsin law, "[u]njust enrichment requires proof of three elements: (1) a
benefit conferred on the defendant by the plaintiff; (2) appreciation or knowledge by the
defendant of the benefit; and (3) acceptance or retention of the benefit by the defendant
under circumstances making it inequitable to do so."  *Sands v. Menard*, 2017 WI 110, ¶ 30,
379 Wis. 2d 1, 18, 904 N.W.2d 789, 798.  Defendant has shown a genuine dispute of
material fact as to its acceptance of the benefit of storage, again making summary judgment
inappropriate.

Specifically, Halliburton argues that BAD cannot thrust a benefit upon it, then
argue that benefit constituted unjust enrichment.  The Wisconsin Court of Appeals agreed
in a case between tenants and landlords, holding that "unjust enrichment further requires
that the defendant accept or retain the benefit . . . the landlords never accepted permanent
structures on their land, and so were under no obligation to pay for them when the tenants
unilaterally decided to leave them there."  *Ludyjan v. Cont'l Cas. Co.*, 2008 WI App 41, ¶ 1,

10

747 N.W.2d 745, 746; *see also Utah Iron v. Wells Fargo Rail*, 634 B.R. 122, 137 (D. Utah 2021) (finding that "an involuntary situation cannot confer a benefit").

Here, the evidence supports a finding that Halliburton did not want to store its cars with BAD; indeed, according to email records, Halliburton spent months negotiating with BAD to retrieve the cars and explicitly rejected BAD's offer of storage on November 11, 2020.   (Atanasoff Declaration (dkt. #45-6) 7.)   Because there is a dispute as to Halliburton's acceptance of the benefit, summary judgment must also be denied as to plaintiff's claim of unjust enrichment.

## IV.   Interference with Business Relations

"Interference with a present or prospective contractual relationship requires proof of the following five elements: '(1) the plaintiff had a contract or prospective contractual relationship with a third party; (2) the defendant interfered with the relationship; (3) the interference was intentional; (4) a causal connection exists between the interference and the damages; and (5) the defendant was not justified or privileged to interfere.'" *Burbank Grease Servs., LLC v. Sokolowski*, 2006 WI 103, ¶ 44, 717 N.W.2d 781, 796 (quoting *Hoey Outdoor Adver., Inc. v. Ricci*, 2002 WI App 231, ¶ 27, 653 N.W.2d 763.)

Here, again, plaintiff has failed to show that there is no dispute of material fact as to the first element, at the very least.   BAD did not proffer evidence of current or potential contracts for the spots occupied by Halliburton cars, making a finding of interference with such contracts impossible.   Of course, that is not to say that BAD cannot provide evidence of prospective contractual relationships at trial, at least to the extent disclosed timely under

Fed. R. Civ. P. 26.  However, without any indication that BAD has a third party to whom it could have rented the spots, the court cannot grant summary judgment on this claim.

## V.     Counterclaims for Replevin and Conversion

"To prove conversion, a plaintiff must show: '(1) a right to the property; (2) an absolute and unconditional right to the immediate possession of the property; (3) a demand for possession; and (4) that the defendant wrongfully and without authorization assumed control, dominion, or ownership of the property.'"  *Russell Dean, Inc. v. Maher*, No. 17 C 8440, 2018 WL 4679573, at *8 (N.D. Ill. Sept. 28, 2018) (quoting *Van Diest Supply Co. v. Shelby Cnty. State Bank*, 425 F.3d 437, 439 (7th Cir. 2005).)  In requesting summary judgment on this claim, BAD argues that Halliburton's counterclaims are barred under theories of judicial estoppel and claim preclusion.[3]  Because Halliburton filed a proof of claim against NIS and argued in the receivership proceedings that NIS had possession of the railcars, plaintiff says that Halliburton should not be allowed to take the position that *BAD* has possession of the railcars in this suit.  (Pl.'s Op. Br. (dkt. 26) 18.)

"[J]udicial estoppel, 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'"  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227, n. 8 (2000)).  The Supreme Court has identified at least three factors relevant to finding judicial estoppel: "First, a party's later position must be "clearly inconsistent" with its earlier position . . . Second, courts regularly inquire whether the party

---

[3] Because BAD asked for summary judgment on both the replevin and conversion claims on the same basis, the court will evaluate both claims together.

has succeeded in persuading a court to accept that party's earlier position . . . A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire*, 532 U.S. at 750-51.  BAD has not shown any of these factors.

The fact that Halliburton filed a receivership claim on August 7, 2020, stating that NIS was in possession of its railcars is not clearly inconsistent with the current suit.  (Fisher Decl. (dkt. #29-8) 2.)  BAD did not take possession of the property and the railcars until December 1, 2020, at which point Halliburton began to discuss its cars with BAD as the new owner of the property.  To the extent that Halliburton now claims BAD, rather than NIS, possesses the railcars, that is because BAD arguably took possession of the cars or at least claimed to control the car's release between filing the proof of claim and this suit. There is also no evidence that the Barron County Court accepted that NIS possesses the cars or made a ruling to that effect.  Finally, Halliburton persuasively argues that it did not have counterclaims against BAD until months after it filed a proof of claim in the receivership proceedings.  (Def.'s Opp'n. (dkt. #34) 31.)  The last argument is clearly right since BAD had no claim to possession of the land, much to less interfere with Halliburton's ability to recover its cars before December 1.  Similarly, no claims against BAD for replevin and conversion had ripened before that date. Accordingly, BAD has not shown that Halliburton raised inconsistent claims likely to create unfair advantages, so judicial estoppel is unwarranted.

As a last-ditch argument, plaintiff cites several cases for the proposition that summary judgment is appropriate where the undisputed facts show that the counter-

13

defendant did not interfere with counter-plaintiff's ability to obtain its property.   (Op. Br. (dkt. #26) 17.)   Here, however, the question of interference is disputed.   As previously mentioned, there are conflicting narratives surrounding Halliburton's efforts to retrieve its cars, and a reasonable jury could find that BAD *did* prevent Halliburton from retrieving its property.   For that reason, summary judgment is inappropriate.

ORDER

IT IS ORDERED that:

1)  Defendant's motion for leave to file a supplemental opposition brief (dkt. #56) is GRANTED.

2)  Plaintiff's motion for partial summary judgment (dkt. #25) is DENIED.

Entered this 1st day of November, 2022.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge